1    G. Mark Albright
     Nevada Bar No. 1394
2    Albright, Stoddard, Warnick and Albright
     801 S. Rancho Dr., Suite D-4
3    Las Vegas, NV 89106
     Phone: (702) 384-7111
4    Fax: (702) 384-0605
     Email: gma@albrightstoddard.com
5    *Attorney for Plaintiff*

6

   *See Signature Page for Additional Counsel*

7

8

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

9

10    **W. A. SOKOLOWSKI,**

11            Plaintiff,

12         v.

13

14    **STEPHEN A. WYNN;**
     **JOHN J. HAGENBUCH;**
15    **RAY R. IRANI;**
     **ROBERT J. MILLER;**
16    **ALVIN V. SHOEMAKER;**
     **J. EDWARD VIRTUE;** and
17    **D. BOONE WAYSON**

18           Defendants,

19

Civil No.

**COMPLAINT**

**JURY DEMAND**

20

**COMPLAINT**

21        **I.**    **JURISDICTION AND VENUE**

22      1.      This Court has jurisdiction pursuant to (a) 28 U.S.C. §1331 because Count I

23   asserts claims for violations of § 14(a) of the Exchange Act and SEC Rule 14a-9; (b) diversity

24   jurisdiction under 28 U.S.C. § 1332(a)(2) , as Plaintiff and each of the Defendants are citizens of

25   different states, and the value of the relief requested exceeds $75,000, exclusive of interest and

26   costs; and (c) the Court's supplemental jurisdiction over the common law claims pursuant to 28

27   U.S.C. § 1367(a).

28

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

2.      This Court has jurisdiction over each Defendant because each either is an individual with sufficient minimum contacts with this District.

3.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a)(2) and (3) and § 1401 because some or all of the events, actions, and failures to act giving rise to the claims asserted herein occurred or were initiated in this District.

## II.      NATURE OF ACTION AND SUMMARY OF CLAIMS

4.      This is a shareholder's action brought by Plaintiff in his capacity as a current shareholder of Wynn Resorts, Limited ("Wynn" or the "Company) on March 5, 2015, the record date for shareholders for the Company's 2015 Annual Meeting.  No claims are asserted herein derivatively on behalf of Wynn or against the Company in whose name the Defendants caused it to issue and disseminate its Proxy Statement dated March 14, 2015 in connection with its forthcoming Annual Meeting of Shareholders scheduled for April 24, 2015 (the "Proxy Statement").

5.      Each of the Defendants, Messrs. Wynn, Irani, Virtue, Hagenbuch, Miller, Shoemaker and Wayson, is presently serving on the Company's Board of Directors ("Board"), and collectively and individually initiated or actively participated in a course of conduct that was designed to, and did, in connection with the content of the Proxy Statement and/or otherwise:

(a) Conceal the fact that the Company's management was and is improperly misrepresenting and historically had misrepresented Wynn's internal controls in order to allow a widespread scheme of bribery, money laundering and other wrongful behavior in violation of applicable federal and other laws and, thereafter through the present, cover-up such wrongdoing;

(b) Deceive the shareholders of Wynn regarding the Defendants' oversight of the management of the Company's operations;

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1  (c) Concealed the fact that the Company had failed to comply with the books and records,

2  and internal controls provisions of the Foreign Corrupt Practices Act (the "FCPA") and the Bank

3  Secrecy Act as well as conceal such violations of law;

4  (d) Conceal material facts with respect to audits of the Company's year-end financial

5  statements performed by Ernst & Young, LLP ("E&Y") including, *inter alia,* that such audits and

6  the reports thereupon were not prepared in accordance with the standards of the Public Company

7  Accounting Oversight Board (United States) a.k.a. Generally Accepted Auditing Standards

8  ("GAAS");

9

10  (e) Conceal the fact that the Defendants are causing waste of the Company's assets by

11  means of, *inter alia,* causing a committee of the Board and counsel to it to commence a purported

12  investigation of possible violations of the FCPA and other violations of law as alleged in a letter

13  sent on behalf of a Wynn shareholder to the Board on December 18, 2014 (the "Demand Letter")

14  without any benefit flowing to the Company.  Such sham investigation is being carried out solely

15  to protect the Defendants and others from personal liability for their long-continuing wrongdoing

16  and the harm it has caused the Company.  Neither the Board nor the committee has validly

17  exercised its business judgment in commissioning such sham investigation, which has been put in

18  the hands of Potter, Anderson & Corroon ("PAC"), a Delaware law firm which has a history of

19  generating "whitewash" reports regarding claims of corporate wrongdoing and which has a bias

20  against any claims alleged by principal counsel for Plaintiff and the shareholder on whose behalf

21  the Demand Letter was sent.[3]  Moreover, evidencing the sham nature of the foregoing proceeding,

22  is the fact that the Board has already sought and obtained the dismissal of many of the claims

23  alleged by various Wynn shareholders in derivative litigation.

24

25

26

27

28  _____
[3] PAC has a long history of assisting boards of directors in developing defensive strategies in opposition to
shareholder pre-suit demands and derivative litigation, uniformly collecting millions of dollars in doing so..

(f) Conceal the fact that the Defendants have disregarded and/or intentionally breached the Company's "Code of Business Ethics" (the "Code"), which was first adopted on May 4, 2004, as well as other written policies governing their conduct;

(g) Enhance the Defendants' positions as directors and/or officers of Wynn while providing each of them with substantial compensation, power, and prestige;

(h) Conceal the fact that the Defendants and senior officers of the Company have given away, directly and indirectly through Wynn's political action committee and otherwise at least $1.8 million in Wynn's corporate funds in 2014 and many millions of dollars in previous years to, *inter alia,* politicians and/or their campaigns, much of it for the personal benefit of officers and directors of the Company without any concomitant benefit to the Company; and

(i) Conceal and misrepresent the reasons why the Board has not nominated Elaine P. Wynn ("Ms. Wynn"), a major shareholder of the Company, for re-election to the Board.

6.     At material times, while serving as Wynn's purportedly independent public accounting firm (*i.e.* Auditor),  E&Y failed to provide to the Company the independent auditing services it was well-compensated to provide, negligently or otherwise failed to conduct audits of the Company's financial statements in accordance with Generally Accepted Auditing Standards ("GAAS") as E&Y was engaged to do, and issued false and misleading "clean" opinion letters as to the company's year-end financial statements.

7.     This action charges the Defendants with directly participating in and/or aiding and abetting violations of §14 (a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 14a-9 thereunder as well as breaching their common law duty of candor owed to Plaintiff and other Wynn shareholders.   Plaintiff seeks, inter alia, a determination that the Proxy Statement as issued and disseminated to Plaintiff and other Wynn shareholders warrants replacement with one in full compliance with applicable law and an Order negating the shareholder votes to be taken at the Company's 2015 Annual Meeting pursuant to the proxies solicited by Defendants by the Proxy

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Statement and related materials.

8.    The allegations in this Complaint are based upon personal knowledge as to Plaintiff and his ownership of shares of Wynn, and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of his counsel, which included, among other things: (a) review and analysis of the Company's public filings with the SEC; (b) review of its 2011-2015 Proxy Statements; (c) review of other publicly available information, including articles in the news media; (d) review of the Company's website and press releases; (e) consultation with persons knowledgeable regarding the facts and circumstances alleged herein; (f) review of filings in shareholder derivative Complaints and related materials in litigations commenced against some or all of the Defendants; (g) review of preliminary and final proxy solicitation materials prepared on behalf of the Defendants and Ms. Wynn; and (h) review of filings with the Federal Election Commission.

### III.    PARTIES AND NON-PARTY WYNN

9.    Plaintiff W.A. Sokolowski owns and has continuously owned common stock of Wynn during the period of the wrongdoing alleged herein and on March 5, 2015.   Plaintiff is a citizen of New Jersey.

10.    Wynn, itself, is not a defendant herein and no claims are asserted against it.  It is, for the purposes of this litigation, entirely passive since the Proxy Statement was caused to be issued and disseminated in its name by the Defendants.  It owns and operates integrated resort properties featuring gaming, retail, convention, and exhibition facilities in Asia and the United States, including within the Macao Special Administrative Region of the People's Republic of China and within this District in Las Vegas, Nevada.

11.    Defendant Stephen A. Wynn ("Mr. Wynn") has been the Company's Chief Executive Officer ("CEO"), and Chairman of the Board ("Chairman").  He has dominated and controlled the Board, hand-selecting those who serve on the Board and determining the

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

remuneration they receive.   In fact, no member of the Company's Board is independent or free from Mr. Wynn's *de facto* control or influence.  Indeed, no one would be nominated to join the Company's Board without his specific direction or approval.   Mr. Wynn consciously and purposely has engaged in a course of conduct that has exposed and continues to expose the Company to potential fines and sanctions and severe scrutiny by federal, state and certain foreign regulators and law enforcement authorities.  The Board continuously has submitted to Mr. Wynn's wishes and provided him with various perquisites and emoluments which are purportedly charged to him at fair market value such as, e.g., a villa on the Company's property in Las Vegas.[7]

12.     Defendant Stephen A. Wynn ("Mr. Wynn") has been the Company's Chief Executive Officer ("CEO"), and Chairman of the Board ("Chairman").  He has dominated and controlled the Board, hand-selecting those who serve on the Board and determining the remuneration they receive.  In fact, no member of the Company's Board is independent or free from Mr. Wynn's *de facto* control or influence.  Indeed, no one would be nominated to join the Company's Board without his specific direction or approval.   Mr. Wynn consciously and purposely has engaged in a course of conduct that has exposed and continues to expose the Company to potential fines and sanctions and severe scrutiny by federal, state and certain foreign regulators and law enforcement authorities.  The Board continuously has submitted to Mr. Wynn's wishes and provided him with various perquisites and emoluments which are purportedly charged to him at fair market value such as, e.g., a villa on the Company's property in Las Vegas.[9]

13.     Defendants Irani, Virtue, Hagenbuch, Miller, Shoemaker and Wayson, are presently  serving on the Board, together with Ms. Wynn, whom they have not nominated for re-election.  Upon information and belief, each of such Defendants as well as Mr. Wynn, is a citizen

---

[7] The recent decision of the Defendants not to re-nominate Mr. Wynn's former wife, Ms. Wynn, to a seat on the Board is purportedly contrary to Mr. Wynn's personal wishes. Indeed, Ms. Wynn has filed her own proxy materials with the SEC and is soliciting proxies from the Company's shareholders.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1    of states other than New Jersey. Messrs. Hagenbuch and Virtue are the Board's nominees for re-

2    election as directors of the company.

3        14.    At all relevant times, each of the Defendants, because of their positions as directors

4    of Wynn, had access to adverse, non-public information about the Company's financial condition

5    and operations and the investigations thereof, including the wrongdoing alleged herein.

6        15.    Each of the Defendants, because of their positions of control and authority as Chief

7    Executive Officer (in the case of Mr. Wynn) and directors of the Company, directly and/or

8    indirectly, exercised control over the contents of the various public statements issued by the

9    Company, including the Proxy Statement, which was issued and  disseminated by them and in

10   their name.

11

12       16.    Each member of the Board knew that operating in Macao involved a higher than

13   normal risk of violating American and Chinese anti-corruption laws.  Nevertheless, in the face of

14   such specific knowledge, the Defendants breached their fiduciary duties by failing to implement or

15   maintain adequate internal controls and accounting systems to prevent violations of the FCPA as

16   well as Nevada gaming regulations and/or to require the Company's management to do so.  Thus,

17   each of them knowingly, recklessly, and/or with gross negligence caused the Company to violate

18   the FCPA as well as the Bank Secrecy Act in order to generate business.  In the case of the

19   Defendants other than Mr. Wynn, they participated and/or acquiesced in such conduct to maintain

20   his favor and keep their positions as Directors of the Company and all of the substantial personal

21

22   benefits that inured to them as a result.

23       17.    Indeed, in *Wynn Resorts, Limited v. Okada*, Case No. 2:12-cv-00400 (D. Nev.), in

24   a Counterclaim asserted by the Company's then largest shareholder, it is claimed that: "Mr. Wynn,

25   has run Wynn Resorts as a personal fiefdom, packing the Board  with  friends  who  do  his

26

27   [9] The recent decision of the Defendants not to re-nominate Mr. Wynn's former wife, Ms. Wynn, to a seat
     on the Board is purportedly contrary to Mr. Wynn's personal wishes. Indeed, Ms. Wynn has filed her own
28   proxy materials with the SEC and is soliciting proxies from the Company's shareholders.

personal  bidding,   and   paying   key executives exorbitant amounts for their unwavering fealty."

18.     Although it appears that the very costly FCPA investigations of the Company have either been suspended or terminated, there are ongoing anti-corruption investigations conducted by the Chinese government that are likely to impact upon Wynn's operations in Macau.  In addition, there are ongoing investigations by the FBI relating to the Company's violations of, *inter alia*, the Bank Secrecy Act.

19.     The Defendants were well-informed about and/or actively participated in the wrongdoing alleged herein, particularly the acquiescence in illegal money laundering activities at the Company's casinos, failure to implement and maintain adequate internal controls as well as deception of the investing public and federal and state regulators.  They abdicated their respective stewardship responsibilities to the Company by acquiescing and/or participating in the wrongdoing alleged herein and by placing their loyalty to Mr. Wynn above their loyalty to the Company.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     The Demand Letter

20.     The Demand Letter sent to the Board on behalf of a Wynn shareholder demanded that the Board cause the Company to sue Mr. Wynn, the members of the Board, the Company's officers, other executives, auditors and legal counsel involved in, among other wrongdoing, the Company's direct and indirect money laundering, payment of bribes and otherwise violating the reporting requirements of the FCPA, the Board's relationship with former director Kazuo Okada (Mr. Okada") and/or engaging in other wrongful conduct.

21.     The Demand Letter accused the members of the Board with acquiescing in and/or covering up the specified wrongful conduct, causing it and/or sitting idly by while the Company concealed its likely exposure in the wake of such conduct.  It also claimed that the Board accepted the funds and highly questionable contacts of former Wynn director (since October 21, 2002), Mr.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Okada, when each member of the Board knew or should have known that he was "unsuitable" to be either a director of the Company or a shareholder. Mr. Okada had made much of his fortune manufacturing gaming machines for Japan's notorious pachinko parlors — and who was apparently well-acquainted with the underside of the mushrooming Asian gambling industry. Red warning flags were highly visible to each member of the Board as to Mr. Okada and his well-known propensity for impropriety. Nevertheless, Mr. Wynn and each member of the Board was willing to make a "pact with the devil" to obtain his financing and contacts and, thereafter, let him remain a shareholder and director once his egregious conduct became known.

22. The claims set forth in the Demand Letter are purportedly being investigated by a "committee" of unidentified members of the Board. However, despite such representations, whatever "investigation" is being carried out is being performed by PAC consistent with what appears to be its ultimate goal, i.e., to "whitewash" the wrongful conduct as alleged in the Demand Letter.

23. By aiding and abetting the Board's waste of Wynn's assets, and likely collecting millions of dollars of the Company's money, PAC is acting consistent with the Board's successful attempt to have dismissed previously alleged and pending claims by Wynn shareholders. Indeed, to carry out their solely personal objectives, the Board has given PAC "carte blanche" and an open checkbook in order to develop a defensive strategy *vis-à-vis* the claims set forth in the Demand Letter.

24. Moreover, PAC explicitly refused to answer questions addressing the *bona fides* of its actions and those of the "committee" of the Board it purports to represent. In particular, it refused to identify the members of such "committee" or provide the Board's resolution appointing it to consider the Demand Letter.[10] In particular, PAC would not answer a single one of the

---

[10] Neither the existence of the "committee" nor its members have been disclosed in the Proxy Statement, which similarly did not disclose the Board's receipt of the Demand Letter nor what has been done in response thereto.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1  questions that would establish, *inter alia*, whether it was solicited by Wynn's General Counsel or

2  some other lawyer (as distinct from the "committee"), when it was contacted and whether it and/or

3  "committee" members had conflicts of interest that would demonstrate their bias and

4  interestedness.

**B.   Macau**

25.   In 2006, Wynn Resorts opened a hotel in Macau under a land concession

agreement granted by the Macau government, with a term running from 2002 to 2022.   In

February 2006, the Company announced that it had submitted an application to the Macau

government for a second land concession agreement to build a new casino resort.

26.   After five years, the second land concession agreement had still not been approved.

In May 2011, at Mr. Wynn's instigation, the Board, with the exception of Mr. Okada, approved a

$135 million "donation" to the University of Macau Development Foundation ("Development

Foundation").   The Macau "donation," was essentially an indirect bribe to the Chancellor of the

Development Foundation who was, coincidentally, head of the Macau government.

27.   The "donation" consisted of a $25 million charitable transfer made in 2011, and a

commitment to make additional transfers of $10 million per year for each of the calendar years

between 2012 and 2022.   The Macau "donation," the largest in the history of the University,

represented an illegal or otherwise improper attempt to influence the Macau government to

expedite approval of the second land concession agreement.   There was no legitimate business

purpose for the "donation" which, if not a bribe, was a waste of Wynn's corporate assets for which

it got nothing in return.

28.   Moreover, the "donation" contravenes the Company's stated policies including,

*inter alia*, the Code, which defines itself as "a statement of policies for the individual and business

conduct of the Company's employees and Directors…."   The Code specifically addressed conduct

such as the "donation" when it stated:

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

"Prohibition on Gifts to Government Officials and Employees…You are prohibited from providing gifts, meals or anything of value to government officials or employees or members of their families in connection with Company business without prior written approval from the Compliance Officer…

Bribery of Government Officials The Company's Policy Regarding Payments to Foreign Officials, the [FCPA], and the laws of many other countries prohibit the Company and its officers, employees and agents from giving or offering to give money or anything of value to a foreign official, a foreign political party, a party official or a candidate for political office in order to influence official acts or decisions of that person or entity, to obtain or retain business, or to secure any improper advantage."

29.    Some time prior to February 8, 2012, the Securities and Exchange Commission (the "SEC"), in response to information that had been provided to it, and based upon a belief that the Macau "donation" was a bribe and that the Company had not properly accounted for it or made appropriate disclosures, commenced an informal investigation.  The SEC thereafter informed the Company that it had commenced an informal inquiry into the Macau "donation."

30.    Ultimately, based upon the information and documents at its disposal, in 2013, the sec informed the company that it had concluded its investigation.  In an 8-K Report with the SEC, Wynn informed shareholders that the investigation had concluded.  In particular, you caused the Company to state in its filing:

"On July 2, the company received a letter from the (commission) stating that the investigation had been completed with the (SEC) not intending to recommend any enforcement action against the company by the SEC."

31.    Speaking to *The Associated Press* from his yacht off the Spanish island of Ibiza following the SEC filing, Mr. Wynn said he never had any doubt federal investigators would "clear" the Company.  He is quoted as saying:

"We were so sanguine that we never paid any attention to it; we had no exposure. It was a nonevent except for the damn newspapers."

32.    Consistent with its unimpressive history of oversight (it encourages Nevada casinos to self-police), in February 2013, based on the facts and documents that were made available to it, the Nevada State Gaming Control Board ("NGCB") purportedly investigated the Macau "donation" and found no violations of its rules and regulations.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

33.     While the Company had, so far, escaped liability under the FCPA or that might be imposed by Chinese authorities as a result of the $135 million "contribution, following the foregoing NGCB decision, in early April, 2013, Mr. Okada sent a letter setting forth the Board's personal responsibility for the "contribution." The letter states, under the heading "Suspicious $135 million donation to the University of Macau Development Foundation" as follows.

"In April 2011, the Board met, discussed, and approved a pledge by Wynn Macau, Limited ("Wynn Macau"), a subsidiary of the Company, to donate HK$1 billion (roughly $135 million) to the University of Macau Development Foundation, at a time when Wynn Macau was seeking local government approval to develop a third casino. This donation is suspicious for a number of reasons, including its enormous size, the fact that the 10-year term of the pledge matches precisely the length of the casino license Wynn Resorts was seeking, and the fact that the lead trustee of the University of Macau Development Foundation also has a position in the Macau government which enables him to influence the issuance of gaming licenses. Mr. Okada questioned and objected to the donation and was ultimately the sole director to vote against it. Mr. Okada has noted that 'I am at a complete loss as to the business justification for the donation, other than that it was an attempt to curry favor with those that have ultimate authority for issuing gaming licenses.' Following the April 2011 board meeting, pursuant to his rights as a director of the Company and in furtherance of his fiduciary duties to stockholders of the Company, Mr. Okada, sought to further investigate the Wynn Macau donation and requested additional information from Wynn Resorts concerning the donation and related matters. When the Company refused to provide the information, Mr. Okada took legal action and was vindicated by a court order requiring Wynn Resorts to comply with Mr. Okada's reasonable requests. As Mr. Okada feared, the questionable Wynn Macau donation has already spawned at least four stockholder lawsuits against the Company and investigations by both the United States Securities and Exchange Commission (for possible violations of law including the Foreign Corrupt Practices Act) and the Nevada Gaming Board. Not only is this enormous financial commitment a drain on the Company's coffers, but now Wynn Resorts stockholders will be saddled with the added costs associated with responding to the regulatory investigations and lawsuits. If the results of these investigations and lawsuits include the development of facts regarding legally questionable practices by the Company, stockholders will be at still further risk."

34.     In response, the Board caused the Company to issue a statement as follows:

"[Mr. Okada's company] Aruze has not been a stockholder of Wynn Resorts, Limited since February 18, 2012 when its shares were redeemed by the Wynn Board after a lengthy, third-party investigation uncovered prima facie evidence of improper conduct under the Foreign Corrupt Practices Act by Mr. Okada, Universal Entertainment and Aruze in their dealings with Philippine officials. This most recent filing is a regrettable attempt to divert attention from the issues facing Mr. Okada and Aruze. Given the fact that Aruze was ejected seven months ago as

a Wynn shareholder based on conduct unacceptable for a gaming licensee, it has absolutely no rights as a shareholder to nominate directors and its invalid nominations have been rejected on this basis."Curiously, in attacking Mr. Okada, presumably upon the advice of the Board's legal counsel, it did not deny his allegations regarding the Company's $135 million "contribution." Notwithstanding the belittling of these investigations, in fact, the Company was caused by the Board to expend substantial sums thereupon which it would not have had to incur but for the illegal or otherwise improper conduct referred to above.  While, ultimately, no charges were brought against the Company or its Board or enforcement actions taken, none of these fortunate outcomes for the Company can be attributed to an absence of serious wrongdoing as claimed above.  In any event, since there was no legitimate corporate purpose for the Macau "donation," it amounted to a waste of the Company's assets for which the Board is responsible.

35.     Moreover, while corruption has been rampant in Macau, the only place where casino gambling in China is legal, the central government increasingly has taken action to penalize companies which have been found to engage in corrupt activities, particularly bribery of governmental officials.  It is inconceivable that the Macau "donation" is not on the "radar screen" of China's anti-corruption regulators and that the Company remains vulnerable to having its otherwise legal activities curtailed or even eliminated.  Thus, any corrupt or otherwise illegal conduct (such as illegal foreign exchange dealings, bribery or money laundering), particularly if the Board acquiesces in such conduct, leaves the Company vulnerable to material negative events, such as interference with its business operations in China and substantial fines.

C.     **The Defendants' Relationship With Mr. Okada**

36.     The Board was more than happy to accept Mr. Okada's capital when it was needed to help the Company, notwithstanding its knowledge that he was, from the outset, an unsuitable shareholder or director of Wynn.  Indeed, material facts regarding his background were kept from the Nevada Gaming Control Board ("NGCB") and other regulators to allow Mr. Okada to act as a director and major shareholder of the Company.  It has been reported that at a 2004 regulatory hearing, a Nevada official told Mr. Okada that Mr. Wynn was putting his reputation on the line in allying himself with him, even if the NGCB had never found ties between Mr. Okada, Japan's

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1    then-largest individual taxpayer, and criminal organizations.[11]

2        37.    Presumably, following a deterioration in the close personal relationship between

3    Mr. Wynn and Mr. Okada, in relation to the Macau "donation," Mr. Okada called into question

4    whether the magnitude of the donation was an appropriate use of the Company's funds.  He also

5    demanded an investigation of the Company's records related to the purported "donation."

6        38.    Although the members of the Board were more than willing to accept Mr. Okada as

7    a business partner and a director of Wynn previously, following Mr. Okada's demands, Mr. Wynn

8    and his allies then retaliated against him.

9

10       39.    In November 2011, the Board retained Freeh Sporkin & Sullivan, LLP ("Freeh"), a

11   law firm with excellent credentials but which could be expected to (and did) perform as expected

12   by the Board, to investigate whether Mr. Okada was "suitable" to own shares of Wynn.  The

13   Board used the Freeh firm's conclusions that he was an "unsuitable" shareholder to justify a

14   forcible redemption of Mr. Okada's $2.77 billion stake in the Company in exchange for a

15   promissory note valued at $1.9 billion.  In particular, the Freeh firm concluded, *inter alia*, with

16   respect to Mr. Okada:

17   

18         "Mr. Okada, his associates and companies have arranged and designed his corporate gaming business and operations in the Philippines in a manner which appears to contravene Philippine Constitutional provisions and statutes that require

19   60% ownership by Philippine nationals, as well as a Philippine criminal statute.

20         Mr. Okada, his associates and companies appear to have engaged in a longstanding practice of making payments and gifts to his two (2) chief gaming

21   regulators at the Philippines Amusement and Gaming Corporation ("PAGCOR"), who directly oversee and regulate Mr. Okada's Provisional Licensing Agreement

22   to operate in that country.

23         Since 2008, Mr. Okada and his associates have made multiple payments to and on behalf of these chief regulators, former PAGCOR Chairman Efraim

24   Genuino and Chairman Cristino Naguiat (his current chief regulator), their families and PAGCOR associates, in an amount exceeding US 110,000.

25

26

27   [11] The relationship with Mr. Okada was so close that the Board agreed to open the Okada Restaurant at the Wynn Las Vegas. That restaurant has now been closed in the wake of the deterioration of that relationship

28   at substantial cost to the Company.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

At times, Mr. Okada, his associates and companies have consciously taken active measures to conceal both the nature and amount of these payments, which appear to be prima facie violations of the United States Foreign Corrupt Practices Act ("FCPA").  In one such instance in September 2010, Mr. Okada, his associates and companies, paid the expenses for a luxury stay at Wynn Macau by Chairman Naguiat, Chairman Naguiat's wife, their three children and nanny, along with other senior PAGCOR officials, one of whom also brought his family.  Mr. Okada and his staff intentionally attempted to disguise this particular visit by Chairman Naguiat by keeping his identity "Incognito" and attempting to get Wynn Resorts to pay for the excessive costs of the chief regulator's stay, fearing an investigation.  Wynn Resorts rejected the request by Mr. Okada and his associates to disguise and to conceal the actual expenditures made on behalf of Chairman Naguiat.

Additionally, Mr. Okada, his associates and companies appear to have engaged in a pattern of such prima facie violations of the FCPA.  For example, in 2010 it also is possible that Mr. Okada, his associates and companies made similar payments to a Korean government official who oversees Mr. Okada's initial gaming investment in that country.  Additional investigation is needed to develop and confirm these possible FCPA violations.

The *prima facie* FCPA violations by Mr. Okada, his associates and companies constitute a substantial, ongoing risk to Wynn Resorts and to its Board of Directors, creating regulatory risk, conflicts of interest and potential violations of his fiduciary duty to Wynn Resorts.

Finally, Mr. Okada's documented refusal to receive Wynn Resorts requisite FCPA training provided to other Directors, as well as his failure to sign an acknowledgment of understanding of Wynn Resorts Code of Conduct, increase this risk going forward."

40.      The foregoing conduct, if as alleged by Freeh, was ample justification for removing Mr. Okada as an "unsuitable" shareholder of the Company.[12]  In fact, each member of the Board was well aware of Mr. Okada's casino project in the Philippines and, if its members did not know of any such alleged illegal payments there, they should have been aware of them when the Board took Mr. Okada on as a partner and asked that he join the Board or thereafter.

41.      Indeed, it is inconceivable that the Board and lawyers assisting it did not thoroughly investigate Mr. Okada and his affiliated companies beforehand.  Notwithstanding his highly questionable background, according to a March 2, 2012 article in *The New York Times*,

---

[12] The Second Amended and Restated Articles of Incorporation of Wynn ("Articles") provide for standards that seek to define an "Unsuitable Person." As set forth on page 8 of the Articles, the phrase Unsuitable Person "shall mean a Person who . . . in the **sole discretion of the board of directors of the Corporation, is deemed likely to jeopardize** the Corporation's or any Affiliated Company's application for, receipt of approval for, right to the use of, or entitlement to, any Gaming License." [emphasis added]

during a May "2008 financial conference call, when asked about Mr. Okada's planned Philippines venture, Mr. Wynn professed his support and counsel on the project." According to the *Times*, Mr. Wynn said: "He's my partner and friend and there is hardly anything that I won't do for him…I love Kazuo Okada as much as any man that I've ever met in my life."

42.     Based upon publicly available information, it appears that it was Mr. Okada's objections to the Macau "donation" and personal disagreements with Mr. Wynn that led the Company, in February 2012, to sue Mr. Okada and the two entities he controls, Aruze and Universal Entertainment Corp., for breach of fiduciary duty rather than his newly-uncovered "unsuitability."[13]

43.     Upon information and belief, such litigation has been stayed at the request of federal prosecutors who have been investigating Mr. Okada and his companies for potential violations of anti-bribery laws in relation to his casino development on Manila Bay.  It has also been reported by *Reuters* that the Philippine government has also been investigating $40 million in payments made by Universal affiliates to a politically-connected consultant in 2010 around the time Universal was lobbying for concessions for its casino resort.

44.     Despite the legitimacy of his objections to the Company's Macau "donation," in making the Faustian bargain that the Board did with Mr. Okada, its members have subjected the

---

[13] Well-before the Macau "donation" issue erupted, the Board and Mr. Wynn in particular, were aware of Mr. Okada's activities in the Philippines and, in particular, statements made regarding Mr. Wynn's involvement therein. The Freeh report states that "Mr. Okada asserted that all his efforts in the Philippines prior to the change of presidential administration in the summer of 2010 were undertaken on behalf of and for the benefit of Steve Wynn and Wynn Resorts, and that he only undertook to develop a gaming business in the Philippines independently subsequent to the change of presidential administrations. On December 20, 2007, Aruze Corp. issued a press release [which] stated the following: "The Company looks to acquire the licenses necessary to operate a casino resort in the Asian region, including Macau, and to commence operation of a casino resort on its own over the next business year. . . . For this know-how, which is vital from a management perspective, the Company intends to enlist the full cooperation of…Steve Wynn in its future pursuits regarding this project. For the purpose of successfully operating a casino resort in the Asian Region on an independent basis, the Company has received agreement from Steve Wynn that he will supply all necessary support, including active personal exchange with Wynn.…" [emphasis added] There is no evidence that neither the Company nor any Board member took steps to contradict Mr. Okada's statements, directly or through Azure.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Company irresponsibly to massive expenses and investigations that could have been avoided. Most recently, the relationship with Mr. Okada has led to further substantial expenses in Japan. On April 24, 2014, Mr. Okada caused his company to file a complaint with the Tokyo District Public Prosecutors Office accusing the Company and Mr. Wynn with "defamation, harm to public trust and circulation of rumors" in relation to the publication of an investigation into his company's conduct in the Philippines.   The Company's response was to the effect that the criminal complaint was an attempt by Mr. Okada "to create a distraction from the investigations pending against him" and that it was related to a previously filed civil defamation case that a dismissed Tokyo court ruling presently being appealed.

### D.    Money Laundering

45.    Macau's casinos such as Wynn's have relied on junket operators for many years to locate gamblers in mainland China and transport them.   Because of Chinese laws restricting capital transfer out of the country (i.e. the mainland), these junket operator/middlemen serve a critical role by providing financing to Chinese players and also to collect gambling debts.

46.    Lax rules and/or non-enforcement of them in Macau allow criminals to transform ill-gotten cash (including restricted capital from the mainland) into legitimate-looking gambling "winnings" from casinos.   A congressional report in October said $202 billion is laundered each year through Macau.   Upon information and belief, you have long known of these illegal practices at the Company's casinos, not only in Macau but elsewhere, particularly in Las Vegas.

47.    Notwithstanding the increasing attention being paid by federal authorities, the Board and Mr. Wynn, in particular, were well aware or should have been aware that money laundering was taking place at the Wynn Las Vegas, some of which was at the behest of drug dealers known to high-level Wynn executives and other employees.   Upon information and belief, a number of Wynn's senior-level executives and "hosts", among others, have been interviewed by

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

FBI and DEA investigators.[14]   Such interviews and the subject matter thereof have created substantial turmoil at the Company's Las Vegas casinos causing employee morale issues, turnover and fear of the consequences of the investigations.

48.   Moreover, upon information and belief, instead of immediately taking action to stop such illegal activity after it was brought to Mr. Wynn's and the Board's attention, and reported it to relevant investigators, it appears that the existence of money laundering "swept it under the rug."

49.   It is believed that there are presently investigations underway regarding the Company's possible violations of the Bank Secrecy Act by, *inter alia*, the FBI, the IRS and the DEA which, if found, would subject it to indictment, massive fines and other expenses.[15]   Indeed, in 2013, Las Vegas Sands, a competitor, was required to pay $47 million in the wake of an investigation of merely two individuals who had used its casinos to launder money.

50.   By acquiescing in money laundering at the Company's casinos, the Board has subjected and may be continuing to subject Wynn to fines and other penalties.   Moreover, in the face of investigative reporting by *The Wall Street Journal* (see, article November 21, 2014), the Board's spokesman, Michael Weaver, the Company's Senior Vice President, is quoted as stating falsely:

> "We are not aware of any criminal investigation of the Company whatsoever and we have serious doubts that any such investigation is taking place."

51.   It is simply inconceivable that the Board and Mr. Weaver were unaware of the fact that the wide-ranging money laundering investigations referred to above were well underway and that present and former employees have been interviewed by the FBI and others in connection therewith.[16]

---

[14] The Demand Letter identified two of the Company's former employees with specific knowledge of Wynn's money laundering practices in Las Vegas.
[15] It is understood that these investigations include interviews by the FBI and DEA of many of the Company's largest customers.
[16] Curiously, following the article in *The Wall Street Journal*, the Board's legal counsel, Donald Campbell,

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

52.     By failing to disclose timely all material facts to the investing public with respect to the money laundering at the Company's casinos and the foregoing investigations, the Board has subjected Wynn to massive claims by purchasers of the Company's securities.   None of such activities, their cover-up nor the existence of the investigations, despite the materiality of such facts, has been disclosed in the Proxy Statement.

### E.     Prostitution

53.     On information and belief, all Board members have been well aware that employees of the Company, directly and indirectly, provide prostitutes to selected gamblers and others at the Wynn Las Vegas, where prostitution is illegal.   Although the NGCB has, to date, been lax in its enforcement, such policy can change at any time.   If it can be shown that the Board and/or the Company's senior executives acquiesced in such illegal conduct, such persons, including Mr. Wynn, could be found to be unsuitable to operate a casino in Nevada or otherwise severely penalized.   Such conduct renders Wynn vulnerable to substantial damages and key executives being found "unsuitable."

### F.     Misuse of the Company's Assets

54.     Mr. Wynn has personally availed himself of corporate assets including, *inter alia*, personal living facilities at a villa on the Company's property, using the Company's decorators, consultants and employees for his personal benefit and otherwise, none of which is accurately reflected in the Proxy Statement.   To the extent thereof, Mr. Wynn should be required to account to the Company and be required to repay it for any such unjust benefits he has received and may be still receiving.

### G.     The Proxy Statement

55.     As they did with respect to previous years' proxy statements, the Defendants

---

Esquire, is quoted in the November 21, 2014 *Las Vegas Review-Journal* as saying "Wynn...doesn't **believe** it's under federal investigation..."[emphasis added]

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

caused the issuance and dissemination of the Proxy Statement, which is in violation of §14(a) of the Securities Exchange Act and Rule 14a-9 promulgated thereunder by the SEC, as well as their duty of candor owed to Plaintiff and other Wynn shareholders. The Proxy Statement, issued and disseminated to Wynn shareholders of record as of March 5, 2015 in connection with the Company's 2015 Annual Meeting of Shareholders, solicits votes on the Defendants' behalf and in support of the proposals advocated by them, including the re-election of directors Hagenbuch and Virtue, ratification of the Audit Committee's selection of E&Y as Wynn's auditor and in opposition to an institutional shareholder's proposal to shed light on Wynn's political contributions ("Political Contribution Transparency" proposal).

56.     Upon information and belief, each of the Defendants personally approved of the substantive content of the Proxy Statement and/or indirectly controlled its content, all the while omitting material facts bearing upon how the shareholders of the Company would vote upon, *inter alia*, the Board's two nominees for re-election to directorships and the continued selection of E&Y as the Company's purportedly independent auditor.

57.     Despite federal disclosure requirements, the Board caused the Proxy Statement to be issued on the Company's behalf to misrepresent and fail to disclose material facts regarding the manner in which Board members were and are selected and evaluated as well as how they have functioned historically in their stewardship of the Company.

58.     In order to induce Wynn's shareholders to vote in favor of, *inter alia*, the re-election of the Defendants' two nominees for re-election. to bolster their apparent legitimacy as directors and to secure E&Y as Wynn's auditor, the Proxy Statement set forth various representations about the purported qualifications of the members of the Board (including 2015's two nominees for re-election, Messrs. Hagenbuch and Virtue), the conduct of the various committees of the Board and their individual members and with respect to E&Y and its services.

59.     Moreover, by failing to disclose the material facts regarding the Defendants'

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

conduct as described herein and in the Demand Letter, the Proxy Statement set forth an unrealistic portrait of the Defendants which presented them as highly credible regarding the issues presented for a shareholder vote.  In particular, had the Defendants disclosed all the material facts with regard to their multi-year misconduct, they would have lost the credibility integral to shareholders' ability to evaluate their recommendations and solicitations.

60.     The deceptive statements regarding the Board and, in particular, the material facts omitted from the Proxy Statement as to the wrongdoing of such directors, are likely to directly cause the re-election of the Board's nominees and to otherwise cause shareholders to vote as recommended by the Defendants.

61.     In addition to the request that Wynn shareholders re-election two directors and vote against the Political Contribution Transparency proposal, the Proxy Statement also asks that the Company's shareholders ratify the Audit Committee's appointment of E&Y as the independent public accountants (i.e. auditor) for the Company.   In seeking such ratification, the Proxy Statement does not disclose the highly material fact that E&Y had failed to conduct its audits of Wynn's financial statements in conformity with GAAS and represented falsely in its opinion letters as to such statements that they were prepared in conformity with Generally Accepted Accounting Principles ("GAAP") when the Board knew or should have known that they were not. In particular, E&Y's failure to expose and disclose, *inter alia,* Wynn's money laundering and the serious breakdown in the Company's controls with respect thereto was a breach of its engagements to provide auditing services in conformity with GAAS.

62.     The Defendants knew but did not disclose in the Proxy Statement that, at minimum, E&Y was undoubtedly negligent or reckless in the performance of its audit responsibilities owed to the Company.  Moreover, the Defendants knew and did not disclose in the Proxy Statement that E&Y had, over a period of many years,  breached its annual contracts with the Company (i.e. the terms of its engagement) in carrying out the audits that it did and by issuing false and misleading

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT

A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1    opinion letters that it knew or should have known were unjustified.

2       63.    As a result of the deceptive Proxy Statement and, in particular, its failure to

3    disclose material facts regarding E&Y and its defective audits and false "opinion" letters, the

4    ratification of E&Y's re-appointment as Wynn's auditor by the Board's Audit Committee,is likely

5    to occur.

6       64.    The Proxy Statement states with respect to the proposed re-election of Messrs.

7    Hagenbuch and Virtue:

8
9    "The Board has voted to reduce the size of Class I to two directors, effective upon
expiration of the terms of the current Class I directors at the 2015 Annual Meeting,
10   resulting in the size of the Board being reduced from eight directors to seven.  The
Board has nominated the two nominees listed below to serve as Class I directors
11   for terms that commence upon election at the 2015 Annual Meeting"

12      65.    In making such statement and others, the Defendants misrepresented that the entire

13   Board voted for such reduction and nominated solely the two nominees.  In fact, the Defendants

14   concealed the fact that they are forcing Ms. Wynn, currently and a long-time director and major

15   shareholder of the Company, off the Board, have not disclosed the reasons for doing so and that

16   she has not so voted.[17]  On March 16, 2015, Ms. Wynn sent a letter to the Company's shareholders

17   stating, *inter alia*,:

18
19   "I have served tirelessly on your behalf for the past 13 years as a director and co-
founder of Wynn Resorts.  The board recently took action to shrink the size of the
20   board by one director and thereby exclude me from the board despite my immense
industry knowledge and expertise, and my role building and promoting the Wynn
21   business and brand through the years.  This action was without merit and therefore,
I have decided to file my nomination and seek your vote for my re-election to the
22   board."[18]

23   _____

24   [17] In fact, the Proxy itself, mailed with the Proxy Statement, misrepresents that **"The Board of Directors**
recommends that you vote FOR" its nominees, Messrs. Hagenbuch and Virtue.[emphasis added]
[18] Ms. Wynn further states therein: "I have more than 40 years of gaming and hospitality experience and
25   have been an integral part of helping the company grow into the successful enterprise it is today.  No one at
the company, other than our Chairman and CEO, is more knowledgeable about its history, its operations, its
26   customers, or its award-winning staff. ..I am also the third-largest stockholder of Wynn Resorts, with more
than 9.5 million shares, representing a 9.4% interest in the company.  It is clear that my interests are very
27   much aligned with the interests of you, my fellow stockholders.  Given my substantial stockholdings in the
company, you can be assured that I am keenly focused on viewing every board action through the lens of
28   generating overall stockholder value.  My unique history with Wynn Resorts has afforded me a strong,
independent voice on the board.  **I do not simply toe the party line and instead hold our management**

66.    The Defendants responded, in part, to Ms. Wynn's letter to the Company's shareholders, while concealing the fact that they had for many years supported her continuation as a director, stating, *inter alia*,:

"Following an extensive process which included multiple meetings and the participation of Ms. Wynn, the Corporate Governance Committee determined not to recommend that Ms. Wynn be re-nominated due to:

concerns over actual and potential conflicts of interest; in this regard the Corporate Governance Committee believes that Ms. Wynn has placed her individual interests ahead of her duties as a director, including in her cross claim against the Company's Chief Executive Officer;

the Committee's view that Ms. Wynn's claims in her lawsuit and ongoing dispute with the Company's Chief Executive Officer have reduced the effectiveness of her participation on the Board; and

the Committee's view that Ms. Wynn is not meaningfully contributing to the Board's discussion and work, which is increasingly conducted at the Board committee level, in which Ms. Wynn is unable to participate due to Ms. Wynn's lack of independence under NASDAQ listing standards and resulting inability to serve on any existing Board committees.

67.    Ms. Wynn contradicted Defendants' statements quoted in the previous paragraph and credibly said in her own supplement to her proxy solicitation:

"For the reasons described in detail above, I represent the superior candidate when compared with Mr. Hagenbuch, who has little, if any, experience in the highly regulated gaming industry. In contrast, I have spent more than four decades in the resort, hospitality and gaming industries. Because of my substantial ownership of the Company, my interests are aligned with yours. Moreover, I am fully committed to continuing my efforts to hold Company management accountable to our stockholders and to represent the views of women on a Board otherwise composed entirely of men."

68.    Ms. Wynn went on to further point out the deceptive nature of the Defendants' statements and said:

"First, the Company Proxy Statement states that the Nominating and Corporate Governance Committee believes that I have placed my own interests ahead of the company's and created actual and potential conflicts of interest because my lawsuit

---

**team, including our Chairman and CEO, accountable to our stockholders.** The board's action to exclude a strong and knowledgeable voice may make for a more homogeneous and compliant board, but I believe that is not at all in the best interests of our stockholders."[emphasis added]

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

against Mr. Wynn, if successful, could trigger a violation of indenture covenants. I believe that this is neither an authentic nor a valid reason to remove me from the Board.

I believe that this is not an authentic reason because **this issue existed at the time of my election to the Board in November 2012 and, in that election, the Board apparently had no problem re-nominating me as a director and urging stockholders to vote for me. The Board's decision not to re-nominate me now, when nothing has changed since the last time I was up for re-nomination, illustrates my belief that this reason is nothing more than a pretext by the Board.**

I also believe that this is not a valid reason. My dispute with Mr. Wynn is one between two stockholders who disagree over the continued validity of a stockholders' agreement entered into long ago. It's a stockholder-to-stockholder issue and not a Board issue. This issue will persist whether or not I serve on the Board, and in my opinion, it does not impact the ability of either of us to act as effective Board members. Furthermore, although I am seeking to gain control of the shares I own, I remain devoted to the company and its future success. I intend to remain a significant stockholder indefinitely. Be assured that my interests as a stockholder are aligned with yours. Furthermore, in my view, there is no actual or potential conflict of interest other than a possible technical violation of the indenture covenants if my cross-claim against Mr. Wynn is successful. A violation of the indenture covenants will only occur if two things happen: there is a change of control of the Company *and*, within 60 days thereafter, certain of the Company's outstanding notes are rated below investment grade by both rating agencies that rate such notes. Even if I win my cross-claim and the Company's notes are downgraded by both rating agencies, such a violation could be prevented by my agreeing to let Mr. Wynn vote fewer shares than he now does, but still a sufficient number to ensure that our combined share total is larger than that of the next-largest stockholder. While such an agreement cannot be certain, as the second and third largest stockholders of the company, respectively, Mr. Wynn and I have every incentive to arrive at an agreement and avoid triggering a covenant violation.

Second, the Company Proxy Statement states that the Committee believes that the pendency of that lawsuit has "reduced the effectiveness" of my participation on the Board because independent directors have voiced concerns that Board discussions could be "negatively impacted by the perception that [I] might seek to utilize statements made at Board meetings" in order to advance my litigation claims or my position as a stockholder. **The Committee apparently did not have concerns about the effectiveness of my participation on the Board or the effect of my presence on deliberations of the Board when it re-nominated me in November 2012, many months after my claim was filed. Once again, I believe that this reason is pretextual, because nothing has changed since the last time I was up for re-nomination.** In fact, I do not recall hearing any member of the Board ever raise concerns about any potential chilling effect that my litigation with Mr. Wynn may have on deliberations. **If any member of the Board had such concerns, it is my view that the issue should have been raised and discussed, rather than referenced for the first time in the Company Proxy Statement.** Moreover, the

independent directors meet in Committee, as well as in executive sessions following Board meetings, so they have ample opportunity to speak with one another without Mr. Wynn or me in attendance.

Finally, the Company Proxy Statement states that the Committee is focused on my "lack of independence under NASDAQ listing standards and resulting inability to serve on any existing Board committees." I find this statement to be quite puzzling. It turns out that likely I am "independent." I believe that I satisfy all of the bright line tests for independence under the NASDAQ rules, and that the Board could make a determination that I am "independent" if it wanted to.  I wouldn't have qualified when I was married to the Chairman and CEO, but obviously that's no longer an issue.  It's simply unfair of the Board to unjustifiably state the opposite conclusion and then use that as a reason for excluding me.  Furthermore, I think that it is a curious argument to make given that the Board chose to shrink the size of the Board rather than nominate an independent director in my place.  As a result, my exclusion from the Board would have absolutely no effect on increasing the number of independent directors who can serve on existing Board committees. All it does is eliminate a strong director from the ranks of the Board.

There are two seats up for election.  I intend to use the proxies given to me to vote for myself and for the one candidate nominated by the Board other than John J. Hagenbuch.  Also, as I discuss in more detail later in this proxy statement, if the stockholders agreement between Mr. Wynn and me is valid, as Mr. Wynn contends, he is obligated to endorse and vote for me as a director.

For the reasons described in detail above, I represent the superior candidate when compared with Mr. Hagenbuch, who has little, if any, experience in the highly regulated gaming industry.  In contrast, I have spent more than four decades in the resort, hospitality and gaming industries.  Because of my substantial ownership of the Company, my interests are aligned with yours.  Moreover, I am fully committed to continuing my efforts to hold Company management accountable to our stockholders and to represent the views of women on a Board otherwise composed entirely of men."

69.     The Proxy Statement also includes a stockholder proposal by the New York State Common Retirement Fund (the "Fund"), the beneficial owner of 284,854 shares as of November 25, 2014 (the " Political Contribution Transparency " Proposal).  The Proxy Statement contains the following description of the Political Contribution Transparency Proposal:

"Resolved, that the shareholders of [the Company] hereby request that the Company provide a report, updated semiannually, disclosing the Company's:

1.     Policies and procedures for making, with corporate funds or assets, contributions and expenditures (direct or indirect) to (a) participate or intervene in any political campaign on behalf of (or in opposition to) any candidate for public office, or (b) influence the general public, or any segment thereof, with respect to an election or referendum.

2.    Monetary and non-monetary contributions and expenditures (direct and indirect) used in the manner described in section 1 above, including: a. the identity of the recipient as well as the amount paid to each; and b. the title(s) of the person(s) in the Company responsible for decision-making.

The report shall be presented to the board of directors or relevant board committee and posted on the Company's website."

70.    The Fund submitted the following Supporting Statement regarding the Political Contribution Transparency Proposal:

"As long-term shareholders of Wynn Resorts, we support transparency and accountability in corporate spending on political activities.  These include any activities considered intervention in any political campaign under the Internal Revenue Code, such as direct and indirect contributions to political candidates, parties, or organizations; independent expenditures; or electioneering communications on behalf of federal, state or local candidates.

Disclosure is in the best interest of the company and its shareholders and critical for compliance with federal ethics laws.  Moreover, the Supreme Court's *Citizens United* decision recognized the importance of political spending disclosure for shareholders when it said, '[D]isclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way.  This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages.'  Gaps in transparency and accountability may expose the company to reputational and business risks that could threaten long-term shareholder value.

Wynn Resorts contributed at least $1,800,053 in corporate funds since the 2004 election cycle.  (CQ: http://moneyline.cq.com and National Institute on Money in State Politics: http://www.followthemoney.org)

However, relying on publicly available data does not provide a complete picture of the Company's political spending.  For example, the Company's payments to trade associations used for political activities are undisclosed and unknown. In some cases, even management does not know how trade associations use their company's money politically.  The proposal asks the Company to disclose all of its political spending, including payments to trade associations and other tax exempt organizations used for political purposes.  This would bring our Company in line with a growing number of leading companies, including Qualcomm, Exelon, Merck and Microsoft that support political disclosure and accountability and present this information on their websites.

The Company's Board and its shareholders need comprehensive disclosure to be able to fully evaluate the political use of corporate assets.  We urge your support for this critical governance reform."

71.    The Proxy Statement contains the Board's argument in opposition to the Political Contribution Transparency Proposal which, while partially accurate, conceals the material fact that

- 26 -

many of the Company's direct and indirect contributions to political candidates, parties, or organizations, independent expenditures and/or electioneering communications (directly or through Wynn Resorts Limited PAC, i.e. "Wynn PAC" its political action committee) on behalf of federal, state or local candidates or parties were made and are being made to benefit personally members of the Board and senior officers of the Company:

"After careful consideration, the Board of Directors recommends that stockholders vote AGAINST this proposal for the following reasons:

The Company operates in a highly regulated industry, and the decisions of federal, state, and local governments can significantly impact the Company. Therefore, the Board believes that it is critical that the Company participate in the political process to protect its business interests and its stockholders' interests. The Company is committed to participating in the political process as a good corporate citizen, in full compliance with applicable laws. The Company also has adopted the Political Contributions Policy and Procedures. In addition to the Company's Code of Business Conduct and Ethics, the Political Contributions Policy and Procedures governs the Company's consideration of political activities, including the Company's political contributions at the federal, state, and local levels and the Company's membership in trade associations.

The Company's political contributions at the federal, state, and local levels are subject to extensive internal review and oversight to confirm their compliance with applicable contribution limits and regulations. Recognizing that the Company likely will not agree with every position a candidate takes, the Company's government affairs team meets with a candidate prior to making significant contributions to determine whether supporting the candidate is in the best interests of the Company and its stockholders. In addition, the Company reports to the Audit Committee on its political contributions on a periodic basis.

The Company also believes that it provides sufficient transparency with respect to its political contributions. The Company's participation in political activities includes contributions to federal elections through Wynn PAC. In compliance with federal law, [Wynn PAC] files regular reports with the Federal Election Commission ("FEC") to disclose political contributions by Wynn PAC. These reports are publicly available on the FEC website. In addition, reports regarding the Company's specific political contributions in various jurisdictions are publicly available at each jurisdiction's official website.

From time to time, the Company pays annual membership dues to industry trade associations. The trade associations in which the Company participates may engage in political activities, but such decisions are governed by those associations' respective bylaws. Thus, even when the Company participates in these associations, the Company does not control how they use membership dues. The Company expects these trade associations to comply with applicable laws with respect to their political activities. As such, the Board believes that additional

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

disclosures regarding the specific payments made to these trade associations would not benefit stockholders.

In sum, the Company already discloses sufficient information regarding its political contributions; and the Company has an appropriate system of oversight, including its Political Contributions Policy and Procedures, designed to confirm that the Company's political contributions comply with applicable law and are in the best, long-term interests of the Company and its stockholders.  Accordingly, the Board believes that preparing an additional report as requested in the proposal would be unnecessary and an imprudent use of the Company's time and resources."

72.   The Proxy Statement failed to disclose that many of the Company's direct and indirect political contributions have absolutely no connection to the Company's business operations or serve any legitimate business purposes.  These included, *inter alia*, contributions to the 2012 presidential campaign of Willard "Mitt" Romney and congressional candidates in districts far-removed from any of the Company's casinos or other businesses.  Indeed, upon information and belief, many or most of such political contributions were made and are being made to reflect the political philosophy of Mr. Wynn and other members of the Board, none of which is disclosed by the Defendants in the Proxy Statement or follow-up solicitation materials.

### H.   FALSE CERTIFICATIONS

73.   As the senior-most officer of the Company, Mr. Wynn, among others in management, had extensive duties to ensure the accuracy and completeness of financial information disseminated to investors.

74.   As noted in American Institute of Certified Public Accountants ("AICPA") auditing standard, Section 110.03, a public company's management is responsible for preparing financial statements in accordance with GAAP:

"The financial statements are management's responsibility....  Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.  The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management.  The auditor's knowledge of these matters and internal controls is limited to that acquired through the audit.  Thus, the fair presentation of financial statements in conformity with generally accepted

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

accounting principles is an implicit and integral part of management's responsibility."

75.    In Accounting Series Release 173 (July 2, 1975), the SEC reiterated the duty of management to present a true representation of a company's operations:

"[I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations."

76.    Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and SEC rules promulgated thereunder, the chief executive officer and chief financial officer of reporting corporations, such as the Company, are required to certify as to the accuracy and completeness of a company's financial statements.

77.    At all relevant times, the Company's senior management, including Mr. Wynn and the members of the Audit Committee,, including Defendant Hagenbuch, repeatedly opined that internal controls over financial reporting were adequate and re-nominated E&Y as Wynn's auditor, despite the fact that there was, *inter alia,,* illegal money laundering at Wynn casinos , as well as other serious wrongful conduct as referred to herein.  Notwithstanding such wrongdoing, Mr. Wynn unjustifiably and repeatedly executed "clean certifications" pursuant to Sections 302 and 906 of SOX.  These certifications falsely and deceptively stated, *inter alia,* that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information.  None of such material facts were disclosed in the Proxy Statement.  In the context of the Defendants' proposed re-election of Defendant Hagenbuch, such omission of material facts is particularly significant.

## V.    BREACHES OF COMPANY POLICIES

78.    As an officer (in the case of Mr. Wynn) and as directors of the Company, the Defendants owed to the Company and its shareholders fiduciary duties of trust, due care, candor, good faith, and loyalty.  Each of the Defendants knew it was his fiduciary duty and responsibility

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

to use his utmost ability to oversee the management and administration of the Company's business and affairs, to ensure that the Company complied with all of its legal obligations and operated in a diligent, honest and prudent manner, and to ensure that effective policies, procedures, systems, and internal controls are in place to prevent, detect and promptly terminate any unlawful corporate conduct or unethical business practices such as those described above.

79.     Each Defendant acquiesced in at least some of the wrongful conduct described herein, thereby breaching his fiduciary duty of loyalty and good faith owed to the Company and its shareholders.  Such conduct was and is not the product of a valid exercise of business judgment, and constitutes a non-exculpable breach of fiduciary duty for which each director faces a substantial threat of personal liability.

80.     Each Defendant breached his respective duty of loyalty and good faith by knowingly permitting and/or acquiescing in historical engagement by the Company's management in violations of the FCPA, anti-money laundering laws and other laws, rules and regulations applicable to Wynn and its subsidiaries, as described herein, and by failing to implement and/or maintain adequate internal controls prevent violations of the FCPA, the Bank Secrecy Act and other laws, as described herein.

81.     The Defendants, as a result of their service on the Board and on the committees described in the Proxy Statement, their knowledge and purported expertise as alleged therein, the receipt by the Board and those committees of regular and complete reports, were aware of the unlawful and unethical business practices alleged herein, yet knowingly and/or recklessly breached their fiduciary obligations as officers and/or directors of the Company, by permitting them to be continued and/or covered-up.

82.     Wynn's improper inducements and underhanded practices aimed at influencing Macau government officials in order to secure favorable concessions for the Company was not the result of a rogue employee or division, but instead, notwithstanding the Code, reflected an

"anything goes" business philosophy, directed, encouraged and aggressively pursued to increase revenues and profits through the payment of bribes in violation of the FCPA, the engagement in money laundering and acquiescence in prostitution at Wynn's casinos over compliance with laws and regulations designed to protect the Company without due regard to the long-term consequences of such wrongdoing. Upon information and belief, these widespread practices were well known to senior management and the entire Board, and were knowingly pursued despite their knowledge of its illegality and/or cover-up and the inevitable long-term harm to the Company. Management of Wynn, accompanied by Board passivity, knowingly made a calculated bet that any legal consequences from the bribery, money laundering and other wrongful conduct described herein would not be found out by governmental regulators and enforcement agencies. By knowingly or negligently permitting this strategy to continue, notwithstanding its well-publicized codes of behavior, the Board adopted such conduct as Company policy, and committed a sustained and systematic failure of compliance oversight in breach of each Board members' fiduciary duty of loyalty and good faith.

83.     To this day, none of the Defendants took steps to disclose publicly in the Proxy Statement or otherwise the Company's bribery, money laundering activities and passive encouragement of prostitution promptly to the DOJ, the SEC, Nevada gaming authorities and other regulatory agencies, as they were legally required to do. Even as to those of the Defendants who may not have been directors of the Company while illegal conduct was taking place, they have nevertheless taken no action to punish those directly responsible for the wrongdoing or to expose it to the light of day.

84.     The Board established a Compliance Committee in order to provide the illusion of compliance with various laws, regulations and the Code. The only current member of the Compliance Committee identified in the Proxy Statement is Gov. Miller, a former governor with extensive political connections in Nevada and elsewhere. Notwithstanding this Committee and

LAW OFFICES

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

despite Mr. Miller's personal knowledge of applicable Nevada, federal and other laws (including Las Vegas' anti-prostitution law),  the Board has  flagrantly disregarded and continues to disregard the Code and other corporate governance guidelines and standards, which have been published hypocritically knowing that they would not be and were not being followed.

## VI.   WRONGDOING OF E&Y

85.   During the period of the wrongdoing alleged herein, the Audit Committee of the Board appointed E&Y as Wynn's independent registered public accounting firm (i.e. auditor).  As an integral part of its obligations to the Company and its shareholders and pursuant to the terms of its annual retention by the Company's Audit Committee, E&Y was obligated to, *inter alia:* carry out its audits in conformity with GAAS, and render its opinions that the Company's financial statements were prepared in conformity with GAAP and were otherwise accurate in all material respects.

86.   It was E&Y's responsibility to evaluate the Company's internal controls, which it repeatedly failed to do over multiple years or, to the extent that it did so, any such evaluation was performed negligently.  Despite knowing otherwise, E&Y stated in each of its annual opinion letters, and in its February 27, 2015 report to the Board and Wynn stockholders, in part, as follows:

> "We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain a reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects….We believe that our audit provides a reasonable basis for our opinions…..
>
> A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting the preparation of financial statements for external purposes in accordance with [GAAP].  A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with [GAAP] and that receipts and expenditures of the company are being made

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

**In our opinion the company maintained in all respects effective internal control over financial reporting as of December 31, 2014."**

87.     Each of the Defendants knew or should have known that the foregoing statements regarding E&Y's audits and Wynn's controls were false. If E&Y had conducted its year-end audits of the Company's consolidated and subsidiary financial statements in conformity with GAAS, as it was contractually obligated to do and represented that it did, it either was obvious or should have been obvious to E&Y that the Company's internal controls were materially deficient and that Wynn had been engaging in the material wrongdoing alleged herein over a period of many years.

88.     E&Y and its engagement partners were motivated to "look the other way" and deliver "clean" opinions as to the Company's year-end financial statements when, in fact, E&Y knew that such "clean" opinions were wholly unjustified. In order to retain the continued patronage and substantial fees generated by the Company, E&Y repeatedly generated "clean," unqualified opinions that the year-end financial statements of the Company and its subsidiaries were prepared in accordance with GAAP and that such statements were audited by it in conformity with GAAS when E&Y knew such representations were false and would deceive the investing public and the SEC.

89.     The false statements made by E&Y in its annual opinion letters on the Company's year-end financial statements were materially false and misleading because of, *inter alia*, the widespread deficiencies in its internal controls known or which should have been known to E&Y, its engagement partners and each of the members of the Audit Committee that allowed much of the unlawful conduct complained of herein to occur, including, *inter alia*, the improper use of Wynn's funds in violation of the FCPA, failing to report known money laundering activities in

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1  violation of the Bank Secrecy Act.

2      90.    Notwithstanding, or perhaps because of E&Y's acquiescence, the Company's Audit

3  Committee repeatedly selected E&Y as the Company's auditor and proposed its choice to Wynn

4  shareholders for ratification, most recently in the Proxy Statement.  By concealing material facts

5  regarding E&Y's competence and credibility as the Company's auditor, the Board's solicitation of

6  shareholder votes in favor of ratification of its re-appointment, was deceptive and in violation of

7  §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.[21]

8

9  ### COUNT I

10  (For Violations of Section 14(a) of the Exchange Act)

11      91.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully

12  set forth herein.

13      92.    This claim is asserted by Plaintiff individually against the Defendants who were

14  members of the Company's Board of Directors when the Proxy Statement was issued and

15  disseminated to Wynn shareholders.  Such claim arises from their violation of Section 14(a) of the

16  Exchange Act and SEC Rule 14a-9 in connection with such Proxy Statement which solicited the

17  votes of Plaintiff and other shareholders in connection with the Company's Annual Meeting of

18  Shareholders to be held on April 24, 2015.

19

20      93.    Through the Proxy Statement, the Defendants solicited the votes of Plaintiff and the

21  other Wynn shareholders in connection with, *inter alia*, the re-election of Messrs.  Hagenbuch and

22  Virtue to the Board, the ratification of the Audit Committee's selection of E&Y to continue as

23  Wynn's auditor and the Political Contribution Transparency Proposal.

24      94.    The Board, through the Proxy Statement, recommended that Wynn shareholders

25  vote in favor of each of the Board's proposals; in particular, in favor of the re-election of each of

26

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

27  [21] While the Board appears to have the power to disregard the shareholder vote should a majority of the shares voting not ratify E&Y as the Company's auditor, in practical terms, the Audit Committee would
28  have to replace E&Y.

the two Board members nominated for re-election, the ratification of the appointment of E&Y as Wynn's auditor and against the Political Contribution Transparency Proposal.

95.     The Proxy Statement contains untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, and failed to disclose material facts as more fully set forth above. In particular, the 2013 and 2014 Proxy Statements failed to disclose material information regarding, *inter alia*, the credibility of the Defendants and their recommended votes, as set forth above.

96.     In addition to the frustration of Plaintiff's personal suffrage rights as a Wynn shareholder, these deceptions materially affect and are likely to proximately cause, *inter alia*, the re-election of Defendants Hagenbuch, the ratification of E&Y as Wynn's auditor and the rejection of the Political Contribution Transparency Proposal.

97.     By utilizing the Proxy Statement as described herein, the suffrage rights of Plaintiff and each other shareholder of the Company have been violated by the Defendants, which conduct is in violation of §14 (a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II

(Breach of the Duty of Candor)

98.     Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

99.     Each of the Defendants, at the time of the issuance and dissemination of the Proxy Statement, by reason of the fact that such Proxy Statements was and is false and misleading, as described herein, breached his respective duties of candor owed to Plaintiff and the Company's other shareholders.

100.    For the reasons set forth with respect to Plaintiff's Exchange Act claims, he is entitled to injunctive relief as set forth below and such damages as he may prove at trial.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that the Proxy Statement is false and misleading in violation of §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and that the Defendants have breached their duty of candor owed to Plaintiff and other Wynn shareholders;

B.    Enjoining the actions taken pursuant to the Proxy Statement at the Company's 2015 Annual Meeting of Shareholders;

C.    Requiring the Defendants to issue and disseminate a replacement for the Proxy Statement that is in compliance with the requirements of applicable federal law and rules and consistent with the Defendants' duty of candor and to hold a meeting of Wynn's shareholders in connection therewith;

D.    Awarding Plaintiff and his counsel reasonable attorneys' fees, expert fees and other reasonable costs and expenses; and

E.    Granting such other and further relief as this Court may deem just and proper.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1

## JURY DEMAND

2

    Plaintiff demands a trial by jury on all claims so triable.

3

Dated: March 24, 2015

4

ALBRIGHT, STODDARD, WARNICK &
ALBRIGHT

5

_____
G. Mark Albright
Nevada Bar No. 1394
801 S. Rancho Dr., Suite D-4
Las Vegas, NV 89106
(702) 384-7111
gma@albrightstoddard.com

6

7

8

9

GREENFIELD & GOODMAN, LLC
Richard D. Greenfield
250 Hudson Street, 8th Floor
New York, NY 10013
(917) 495-4446
whitehatrdg@earthlink.net

10

11

12

13

**Counsel for Plaintiff**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28